**William D. DANIEL, M.D., et al., Plaintiffs,**

v.

**Cecil H. UNDERWOOD, et al., Defendants.**

No. CIV.A. 2:98–0495.

United States District Court, S.D. West Virginia, Charleston Division.

July 7, 2000.

Mary M. Downey Tower, Charleston, WV, Janet Benshoof, Simon Heller, Julie F. Kowitz, Sharon J. Persons, and Bonnie Scott Jones, The Center for Reproductive Law & Policy, New York, NY, for Plaintiffs.

James Bopp, Jr., Richard E. Coleson, Thomas J. Marzen—Bopp, Coleson & Bostrom, Terre Haute, IN, G. Patrick Stanton—Stanton & Stanton, Fairmont, WV, for Defendant Underwood.

Jon R. Blevins, Assistant Prosecuting Attorney—Office of the Prosecuting Attorney for Kanawha County, Charleston, WV, for Defendant Forbes.

Jeffery A. Davis—Office of Prosecuting Attorney, Clay, WV, for Intervenor–Defendant Davis.

Lucien R. Sammons, Jr.—Office of Prosecuting Attorney, West Union, WV, for Intervenor–Defendant Sammons.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Pending before the court are the Plaintiffs' Motion for Summary Judgment and Governor Underwood's Second Motion for Summary Judgment and Dismissal. These motions require the court to assess the constitutionality of provisions of the Women's Access To Health Care Act ("Act") that ban an abortion procedure that the Act characterizes as "partial-birth

abortion." The United States Supreme Court's decision in *Stenberg v. Carhart,* —— U.S. ——, 120 S.Ct. 2597, —— L.Ed.2d —— (2000), compels the conclusion that the provisions of the Act that prohibit "partial-birth abortion" violate the United States Constitution. Accordingly, the court **GRANTS** the Plaintiffs' Motion for Summary Judgment and **DENIES** Governor Underwood's Second Motion for Summary Judgment and Dismissal.

## I.

The Women's Access To Health Care Act, *W. Va.Code* § 33–42–1 *et seq.* (Supp. 1998), predominantly regulates the ability of women to receive health care services under their insurance plans. Two sections, however, ban an abortion procedure that the Act characterizes as "partial-birth abortion." *See W. Va.Code* §§ 33–42–3(3)–(5) and 33–42–8. Section 33–42–8 states:

> Any person who knowingly performs a partial-birth abortion and thereby kills a human fetus is guilty of a felony and shall be fined not less than ten thousand dollars, nor more than fifty thousand dollars, or imprisoned not more than two years, or both fined and imprisoned. This section does not apply to a partial-birth abortion that is necessary to save the life of a mother when her life is endangered by a physical disorder, illness or injury.

*Id.* § 33–42–8(a). The Act defines "partial-birth abortion" as "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery." *Id.* § 33–42–3(3). It further defines "vaginally delivers a living fetus before killing the fetus" as "deliberately and intentionally delivering into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure that the physician or person delivering the living fetus knows will kill the fetus, and kills the fetus." *Id.* § 33–42–3(5).

The plaintiffs filed suit to enjoin the enforcement of these provisions of the Act, alleging that the ban on "partial-birth abortion" violates women's right to privacy as set forth in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Specifically, the plaintiffs contend that the "partial-birth abortion" ban (1) infringes on a woman's bodily integrity without any compelling or even legitimate state interest; (2) imposes an undue burden on a woman's right to choose an abortion; (3) proscribes abortion methods that could be the safest in certain circumstances; and (4) lacks any health exception and any medical emergency exception. *See* Plaintiffs' Fourth Amended Complaint ¶ 3. The plaintiffs further assert that the ban violates the Due Process Clause, the Equal Protection Clause, and the First Amendment of the United States Constitution. *See id.* ¶¶ 4–7.

The plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction with their initial complaint. After a hearing on June 11, 1998, the court granted the plaintiffs' motion and issued a temporary restraining order ("TRO") that temporarily restrained and enjoined enforcement of Sections 33–42–3(3)–(5) and 33–42–8 of the Act. In granting the plaintiffs' motion, the court made the following findings: (1) "the Act on its face threatens the plaintiffs' patients with deprivation of their constitutional right to privacy as articulated in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)," (2) "the plaintiffs' patients may be denied appropriate medical care either because physicians, fearing liability under the Act, will choose not to treat the patient or will treat the patient using a riskier medical procedure," and (3) "the Act makes no exception for the protection of the mother's health or

for medical emergencies that are not life-threatening." Temporary Restraining Order at 3. The court combined the hearing for preliminary injunction with a trial on the merits, and the parties agreed that the TRO would extend until the trial. The parties have since agreed that a trial is unnecessary and that the case may be resolved on cross-motions for summary judgment.

On December 15, 1999, the plaintiffs filed a motion to stay the proceedings in this matter until the United States Supreme Court ruled on the appeal of the United States Court of Appeals for the Eighth Circuit's decision in *Carhart v. Stenberg*, 192 F.3d 1142 (8th Cir.1999), *affirmed*, —— U.S. ——, 120 S.Ct. 2597, —— L.Ed.2d —— (2000). The court granted the plaintiffs' motion, finding that the "statutory language and issues involved in *Carhart* and the present case are virtually identical" and that "the Supreme Court's ruling [would] undoubtedly guide, if not control, this court in evaluating the constitutionality of West Virginia's 'partial-birth abortion' ban." Order Staying Proceedings at 2–3. The court ordered the TRO to remain in effect during the pendency of the stay. *Id.* at 4. The United States Supreme Court recently issued its decision in *Carhart*, —— U.S. ——, 120 S.Ct. 2597, —— L.Ed.2d —— (2000) signaling the end of the stay period.

## II.

Although the parties in this case are in agreement concerning the material technical descriptions of various abortion procedures, the parties dispute which abortion procedures fall under the Act's prohibition. The plaintiffs argue that the Act is unconstitutional because its plain language bans all common abortion procedures, including suction curettage, dilation and evacuation (hereinafter "D & E"), and intact D & E, also known as dilation and extraction (hereinafter "D & X").[1] Governor Underwood contends that the Act only bans the D & X procedure, which he equates with "partial-birth abortion," and that the Act therefore does not violate the United States Constitution. Because the similarities and differences between these procedures are important to the court's analysis, the court finds it necessary to describe the various abortion methods.[2] The court regrets that it must do so in a way that may be upsetting, or even offensive, to some.

Suction curettage, or vacuum aspiration, is the predominant method of abortion during the first thirteen or fourteen weeks of pregnancy.[3] deProsse Dec. ¶ 25; Harish Dec. ¶ 6. The physician begins this procedure by dilating the cervix with metal dilators. deProsse Dec. ¶ 25; Harish Dec. ¶ 6. The physician then inserts a tube, called a cannula, through the woman's vagina and into her uterus. Harish Dec. ¶ 6. The cannula is attached to a vacuum generator, which the physician uses to remove the embryo or fetus and other products of conception. deProsse Dec. ¶ 25; Harish Dec. ¶ 6. After attempting to empty the uterus with suction, the physician passes a sharp curette through the uterus to make sure that it is completely empty. Daniel Dec. ¶ 12; Harish Dec. ¶ 8. If products of conception remain in the uterus, the physician uses additional suction or forceps to

---

1. The court defines these terms below.

2. For further discussion of the suction curettage, D & E, and D & X procedures, see *Carhart*, 120 S.Ct. at 2605–608. The district court in *Carhart* conducted a trial on the merits. Accordingly, the record before the Supreme Court in *Carhart* was more developed than the record before this court. The parties in this matter, however, have agreed to dispose of this case on summary judgment, and the court therefore concludes that they must deem the record sufficient for that purpose. Further, the evidence before the court concerning abortion procedures is consistent with that discussed in *Carhart*. Given the Supreme Court's decision in *Carhart*, the court does not believe that further development of the record would alter the court's analysis.

3. Physicians calculate the weeks from the woman's last menstrual period, or "lmp."

remove the remaining tissue. Daniel Dec. ¶ 12; Daniel 2d Dec. ¶ 3; Harish Dec. ¶ 8; Lewis 2d Dec. ¶ 3.

After the first thirteen or fourteen weeks of pregnancy, the most common abortion procedure is dilation and evacuation, or D & E. deProsse Dec. ¶ 26. This method accounts for approximately 96% of post-first-trimester abortions. *Id.* The physician begins a D & E procedure by dilating the woman's cervix with osmotic dilators for twelve to thirty-six hours. *Id.* ¶ 27; Harish Dec. ¶ 10. After removing the dilators, the physician suctions out the amniotic fluid. deProsse Dec. ¶ 27; Harish Dec. ¶ 11. Once the fluid is removed, the physician reaches into the uterus with forceps and grasps the fetus. deProsse Dec. ¶ 27; Harish Dec. ¶ 11. The physician pulls the grasped part through the cervix and into the vagina. Usually, the remainder of the fetal body is too large to pass through the cervix and will create traction, against which the physician will pull and detach the grasped fetal part. Harish Dec. ¶ 11. When this happens, the physician repeats the insertion and withdrawal of forceps until the fetus and all products of conception have been removed. *Id.* In some instances, the grasped part does not detach and the physician is able to pull the entire fetal body through the cervix. deProsse Dec. ¶ 28; deProsse Dep. at 17–18; Harish Dec. ¶ 11. Regardless of whether the physician removes the fetal body intact or through repeated insertions of the forceps, the skull typically cannot fit through the cervix, and the physician must compress it to remove it. deProsse Dec. ¶ 27; Harish Dec. ¶ 11.

During the second trimester, some physicians use the D & X procedure, a variant of D & E. deProsse Dec. ¶ 29. The physician dilates the cervix and then performs a breech extraction of the intact fetal body until the cervix is obstructed by the skull. Stipulation Re "Intact D & X" Abortion ¶ 1; deProsse Dec. ¶ 29. The physician then either crushes the skull with forceps or creates a small opening at the base of the skull and evacuates its contents. *See* Stipulation Re "Intact D & X" Abortion ¶¶ 1–3. The skull collapses and passes through the cervix, effecting vaginal delivery of a dead but otherwise intact fetus. *See id.* ¶¶ 1–2; deProsse Dec. ¶ 29.

## III.

In *Stenberg v. Carhart,* the United States Supreme Court held that Nebraska's statute banning "partial birth abortion" violated the United States Constitution. *Carhart,* 120 S.Ct. at 2605. In reaching this holding, the Supreme Court considered the following principles of abortion law: (1) "before 'viability ... the woman has a right to choose to terminate her pregnancy;'" (2) "'a law designed to further the State's interest in fetal life which imposes an undue burden on the woman's decision before fetal viability' is unconstitutional;" and (3) "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 2604 (quoting *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 870, 877, 879, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (internal citations omitted)). Applying these principles to the Nebraska statute, the court concluded that the statute was unconstitutional for the following independent reasons: (1) the statute lacks any exception for the health of the mother; and (2) the statutory language prohibits D & E abortions, thereby imposing an undue burden on a woman's ability to choose a D & E abortion and "unduly burdening the right to choose abortion itself." *Id.* at 2609.

The Nebraska statute banning "partial birth abortion" is virtually identical to the West Virginia ban. The Nebraska law states: "No partial birth abortion shall be performed in this state, unless such procedure is necessary to save the life of the

684

mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." *Id.* at 2604–05 (quoting *Neb.Rev.Stat. Ann.* § 28–328(1) (Supp.1999)). The statute defines "partial birth abortion" as "an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery." *Id.* at 2605 (quoting *Neb.Rev.Stat. Ann.* § 28–326(9)). It further defines "partially delivers vaginally a living unborn child before killing the unborn child" as "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child." *Id.* (quoting *Neb.Rev.Stat. Ann.* § 28–326(9)). Based on the virtually identical language found in the Nebraska and West Virginia statutes, the court finds that the Supreme Court's decision in *Carhart* not only guides, but controls the court's evaluation of the constitutionality of West Virginia's ban.

**A.**

■ West Virginia's ban on "partial-birth abortion" fails to provide an exception for the preservation of the health of the woman and therefore violates the United States Constitution. As stated by the *Carhart* Court, the United States Supreme Court in *Casey* reiterated the Court's holding in *Roe:* "[S]ubsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 2609 (quoting *Casey,* 505 U.S. at 879, 112

S.Ct. 2791 (emphasis omitted.) (quoting *Roe,* 410 U.S. at 164–65, 93 S.Ct. 705)). The Court in *Carhart* noted that the Nebraska law applies both pre-and post viability and stated that because "the law requires a health exception in order to validate even a postviability abortion regulation, it at a minimum requires the same in respect to previability regulation." *Id.* (citations omitted). The Court further indicated that "a risk to a women's [sic] health is the same whether it happens to arise from regulating a particular method of abortion, or from barring abortion entirely." *Id.*

Governor Underwood argues, as did the State of Nebraska in *Carhart,* that the D & X procedure is never necessary to preserve maternal health. *See* Supplemental Memorandum of Law Opposing Plaintiffs' Motion for Summary Judgment at 6, 8. The Governor asserts that other at least equally safe procedures are available. *Id.* at 8. The record in this case, however, contains the following medical authority supporting the proposition that D & X is the safest procedure in certain circumstances.[4]

The D & X procedure "may reduce the risk of uterine perforation because it can eliminate the insertion of sharp instruments into the uterus, and because the fetus passes through the birth canal intact." deProsse Dec. ¶ 29. "In a D & E in which the physician disarticulates the fetus, sharp instruments and sharp fetal fragments may damage the woman's uterus." *Id.* A D & E requires repeated passes with the suction curette and the forceps, which can perforate the uterine wall. deProsse Dep. at 39. Further, a D & X may result in "less blood loss and less trauma for some patients and may take less operating time, thus reducing anesthesia needs." deProsse Dec. ¶ 29. It therefore may have certain advantages over D & E for some patients. *Id.* ¶ 58.

The court recognizes that D & X has not been the subject of comparative clinical

---

4. For additional authority regarding the safety of the D & X procedure, see *Carhart,* at 2609–611.

trials and that there is no data comparing it with other procedures. *Id.* ¶¶ 58–59; *see* Cornell Dec. ¶ 10. The court further notes that Governor Underwood has presented sworn statements describing the risks involved in the D & X procedure, including future cervical incompetence and risks of uterine perforation and cervical damage, and concluding that other procedures are at least equally safe. Giles 2d Dec. ¶¶ 7–11. The lack of controlled medical studies and the conflicting medical evidence do not, however, demonstrate that the "partial-birth abortion" ban does not need a health exception. Rather, they demonstrate "uncertainty, a factor that signals the presence of risk, not its absence." *Carhart,* at 2612. According to the Court in *Carhart,* "the uncertainty means a significant likelihood that those who believe that D & X is a safer abortion method in certain circumstances may turn out to be right. If so, then the absence of a health exception will place women at an unnecessary risk of tragic health consequences." *Id.* at 2613.

The *Carhart* Court further found that the *Casey* phrase "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother," 505 U.S. at 879, 112 S.Ct. 2791, does not require absolute necessity, absolute proof, or unanimity of medical opinion. *Carhart,* at 2612. The Court emphasized that physicians often differ in their assessment of health risks and appropriate treatment. *Id.* The words "appropriate medical judgment" must encompass the judicial need to tolerate these differences in medical opinion. *Id.*

As the Supreme Court concluded in *Carhart,* a statute that bans D & X creates a significant health risk and must therefore provide an exception for preservation of the health of the woman. *Id.* at 2613. West Virginia's "partial-birth abortion" ban lacks such an exception. Accordingly, the court FINDS that Sections 33–42–3(3)–(5) and 33–42–8 of the Act are unconstitutional for failure to provide an exception for preservation of the health of the woman.

### B.

 The provisions of the Act banning "partial-birth abortion" are also unconstitutional for placing an undue burden upon a woman's right to previability abortion. An abortion regulation imposes an undue burden if it has the "effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 2613. (quoting *Casey,* 505 U.S. at 877, 112 S.Ct. 2791). West Virginia's "partial-birth abortion" ban prohibits D & E, in addition to D & X, and therefore violates the "undue burden" principle.

The Act prohibits "deliberately and intentionally delivering into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure that the physician or person delivering the living fetus knows will kill the fetus, and kills the fetus." *W. Va.Code* § 33–42–3(5). Although the Governor argues that this language bans only D & X, the language does not "track the medical differences between D & E and D & X." *Carhart,* at 2614. Rather, the language covers both the D & E and D & X procedures. *See id.* (stating that plain language of Nebraska statute "covers both procedures").

As indicated by the Supreme Court, "[b]oth procedures can involve the introduction of a 'substantial portion' of a still living fetus, through the cervix, into the vagina." *Id.* The term "substantial portion" as used in the prohibition includes an arm or leg of a living fetus and is not restricted to the entire fetal body up to the head. *See id.* at 2616 (stating that "it is not reasonable to replace the term 'substantial portion' with the ... phrase 'body up to the head.'") According to the *Carhart* Court, one could not "distinguish, using this language, between D & E (where a foot or arm is drawn through the cervix)

and D & X (where the body up to the head is drawn through the cervix)." *Id.* at 2613. As demonstrated by the evidence in this case, the D & E procedure often involves pulling an arm or leg of a still living fetus into the vagina prior to the fetal demise. In fact, the dismemberment of the fetus often does not occur until after the portion of the living fetus has been pulled into the vagina and the remainder of the fetal body meets resistance from the cervix, thus creating traction and allowing for detachment of the fetal part. *See* deProsse Dep. at 40; Harish Dec. ¶ 11.

Further, the "procedure that the physician or person delivering the living fetus knows will kill the fetus" is not a separate procedure distinguishable from the overall abortion procedure. *See Carhart*, at 2616. The phrase does not include the "critical word 'separate,'" *id.*, and the statute contains no language to support such a construction. The court therefore does not interpret the word "procedure" to mean a procedure performed within the overall abortion procedure that the physician uses to kill the fetus. The inclusion of the word "procedure" in the Act therefore does not exclude the D & E procedure from its prohibition.

The court also does not read the word "delivery" to exclude D & E from the Act's prohibition. As stated by the Supreme Court, "obstetric textbooks and even dictionaries routinely use that term to describe any facilitated removal of tissue from the uterus, not only the removal of an intact fetus." *Id.* at 2616 (citations omitted). The statute itself states that it applies to the delivery into the vagina of a living fetus or substantial portion thereof. *W. Va.Code* § 33–42–3(5). One cannot therefore "explain how introduction of a substantial portion of a fetus into the vagina pursuant to D & X is a 'delivery,' while introduction pursuant to D & E is not." *Carhart*, at 2616.

The plain statutory language of the West Virginia "partial-birth abortion" ban prohibits the D & E and D & X procedures. D & E is the most commonly used second trimester procedure. Accordingly, those who perform abortion procedures using D & E "must fear prosecution, conviction, and imprisonment." *Id.* at 2617. "The result is an undue burden upon a woman's right to make an abortion decision." *Id.* Accordingly, West Virginia's "partial-birth abortion" ban violates the United States Constitution.

## IV.

For the foregoing reasons, the court **FINDS** that Sections 33–42–3(3)–(5) and 33–42–8 of the West Virginia Code are unconstitutional. Accordingly, the court **GRANTS** the Plaintiffs' Motion for Summary Judgment and **DENIES** Governor Underwood's Second Motion for Summary Judgment and Dismissal. The defendants are hereby **PERMANENTLY RESTRAINED AND ENJOINED** from enforcing Sections 33–42–3(3)–(5) and 33–42–8 of the West Virginia Code. The Plaintiffs' Motion to Strike Portions of the Second Declaration of Dr. Giles is **DENIED AS MOOT.**