**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RICHMOND MEDICAL CENTER FOR
WOMEN; WILLIAM G. FITZHUGH,
M.D., on behalf of themselves, their
staffs, and their patients,
            *Plaintiffs-Appellees,*

v.

DAVID M. HICKS, in his official
capacity as Commonwealth
Attorney for the City of Richmond;
WADE A. KIZER, in his official
capacity as Commonwealth
Attorney for the County of Henrico,
            *Defendants-Appellants.*

HORATIO R. STORER FOUNDATION,
INCORPORATED,
        *Amicus Supporting Appellants,*

and

PHYSICIANS FOR REPRODUCTIVE CHOICE
AND HEALTH; VANESSA E. CULLINS,
Vice President for Medical Affairs,
Planned Parenthood Federation of
America; FORTY-TWO INDIVIDUAL
PHYSICIANS,
        *Amici Supporting Appellees.*

No. 03-1821

RICHMOND MEDICAL CENTER FOR WOMEN; WILLIAM G. FITZHUGH, M.D., on behalf of themselves, their staffs, and their patients,
                    *Plaintiffs-Appellees,*

v.

DAVID M. HICKS, in his official capacity as Commonwealth Attorney for the City of Richmond; WADE A. KIZER, in his official capacity as Commonwealth Attorney for the County of Henrico,
                    *Defendants-Appellants.*

HORATIO R. STORER FOUNDATION, INCORPORATED,
        *Amicus Supporting Appellants,*

and

PHYSICIANS FOR REPRODUCTIVE CHOICE AND HEALTH; VANESSA E. CULLINS, Vice President for Medical Affairs, Planned Parenthood Federation of America; FORTY-TWO INDIVIDUAL PHYSICIANS,
        *Amici Supporting Appellees.*

No. 04-1255

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-03-531-3)

Argued: October 26, 2004

Decided: June 3, 2005

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

---

Affirmed by published opinion. Judge Michael wrote the majority opinion, in which Judge Motz joined. Judge Niemeyer wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** William Eugene Thro, Deputy State Solicitor, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Suzanne Novak, CENTER FOR REPRODUCTIVE LAW AND POLICY, New York, New York, for Appellees. **ON BRIEF:** Jerry W. Kilgore, Attorney General of Virginia, Judith Williams Jagdmann, Deputy Attorney General, David E. Johnson, Deputy Attorney General, Edward M. Macon, Senior Assistant Attorney General, James C. Stuchell, Assistant Attorney General, Anthony P. Meredith, Assistant Attorney General, Richmond, Virginia, for Appellants. Priscilla J. Smith, CENTER FOR REPRODUCTIVE LAW AND POLICY, New York, New York, for Appellees. James Bopp, Jr., Richard E. Coleson, Thomas J. Marzen, Jeffrey P. Gallant, BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Amicus Supporting Appellants. David S. Cohen, WOMEN'S LAW PROJECT, Philadelphia, Pennsylvania; Susan Frietsche, Stacey I. Young, WOMEN'S LAW PROJECT, Pittsburgh, Pennsylvania, for Amici Supporting Appellees.

---

## OPINION

MICHAEL, Circuit Judge:

This case involves a facial challenge under the Fourteenth Amendment to a Virginia statute that attempts to criminalize "partial birth abortion," which the statute terms "partial birth infanticide." In a summary judgment order the district court declared the statute invalid for

several reasons. We affirm because it lacks an exception to protect a woman's health.

## I.

### A.

Chapters 961 and 963 of the 2003 Acts of the Virginia General Assembly ("the Act") make it a Class 4 felony for a person to knowingly perform "partial birth infanticide." Va. Code Ann. § 18.2-71.1. A Class 4 felony in Virginia is punishable by a prison term of up to ten years and a fine of up to $100,000. *Id.* § 18.2-10. The Act defines "partial birth infanticide" as

> any deliberate act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed.

*Id.* § 18.2-71.1(B). The phrase "human infant who has been born alive" is defined as

> a product of human conception that has been completely or substantially expelled or extracted from its mother, regardless of the duration of pregnancy, which after such expulsion or extraction breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.

*Id.* § 18.2-71.1(C). The Act defines the phrase "substantially expelled or extracted from [the] mother" as (i) when "the infant's entire head is outside the body of the mother" in the case of a headfirst presentation, or (ii) when "any part of the infant's trunk past the navel is outside the body of the mother" in the case of a breech presentation. *Id.* § 18.2-71.1(D). The Act provides the following exception to the general prohibition:

> This section shall not prohibit the use by a physician of any procedure that, in reasonable medical judgment, is necessary to prevent the death of the mother, so long as the physician takes every medically reasonable step, consistent with such procedure, to preserve the life and health of the infant. A procedure shall not be deemed necessary to prevent the death of the mother if completing the delivery of the living infant would prevent the death of the mother.

*Id.* § 18.2-71.1(E). The Act's ban of certain abortion procedures does not provide an exception for instances in which an otherwise banned procedure is necessary, in appropriate medical judgment, to preserve a woman's health. Indeed, the Virginia General Assembly rejected proposed amendments that would have provided a statutory exception for some circumstances when a woman's health was at risk. *See Richmond Med. Ctr. for Women v. Hicks*, 301 F. Supp. 2d 499, 502 (E.D. Va. 2004). The General Assembly failed to include a health exception even though an earlier Virginia statute banning late-term abortions was struck down because it lacked an exception for instances when continuation of a pregnancy poses a threat to a woman's health. *See Richmond Med. Ctr. for Women v. Gilmore*, 224 F.3d 337, 339 (4th Cir. 2000). The Virginia House of Delegates also rejected proposed amendments that would have limited the Act's prohibition to postviability abortions. *See Hicks*, 301 F. Supp. 2d at 502.

The Act challenged in this case excludes the following from the definition of "partial birth infanticide":

> (i) the suction curettage abortion procedure, (ii) the suction aspiration abortion procedure, (iii) the dilation and evacuation [(D&E)] abortion procedure involving dismemberment [(disarticulation)] of the fetus prior to removal from the body of the mother, [and] (iv) completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.

Va. Code Ann. § 18.2-71.1(B). By excepting only a single variant of the D&E procedure, that involving fetal disarticulation prior to removal from the woman's body, the Act prohibits all other D&E variations meeting the statutory definition of "partial birth infanti-

cide." One prohibited variant is the intact D&E, which does not involve disarticulation and in which the fetus is removed from the uterus through the cervix in one pass rather than several. Depending on the presentation of the fetus, an intact D&E proceeds in one of two ways. In the case of a vertex presentation, the physician collapses the fetal calvarium and then extracts the entire fetus through the cervix. In the case of a breech presentation, the physician pulls the fetal trunk through the cervix, collapses the fetal calvarium, and then completes extraction of the fetus through the cervix. A second variation prohibited by the Act is the dilation and extraction (D&X) procedure, which is similar to the breech extraction variant of the intact D&E in all material respects except that it involves the intentional repositioning of the fetus to a breech presentation. Because the intact D&E and D&X procedures are so similar, they are often referred to interchangeably. A third variation prohibited by the Act involves the D&E in which fetal disarticulation occurs outside of the woman's body. Disarticulation generally occurs beyond the cervical os (the lower portion, or opening, of the cervix) as a result of traction against the cervix. However, disarticulation may occur outside of the woman's body when there is little or no space between the cervical os and the vaginal introitus (the vaginal canal) or when the cervical os prolapses (emerges) outside the vaginal introitus. (The Act also criminalizes the treatment of certain incomplete miscarriages.)

Plaintiff William G. Fitzhugh, M.D. is a board certified obstetrician and gynecologist who is licensed to practice medicine in Virginia. Dr. Fitzhugh performs abortions through twenty weeks of pregnancy; he therefore does not perform any postviability abortions. Some of the abortions he performs, particularly intact D&Es and D&Es in which fetal disarticulation occurs outside of the woman's body, are prohibited by the Act. Dr. Fitzhugh performs some of these abortions on the premises of plaintiff Richmond Medical Center for Women (RMCW) where he is Medical Director.

B.

The Act was scheduled to take effect on July 1, 2003. On June 18, 2003, RMCW and Dr. Fitzhugh filed a complaint against two Commonwealth's Attorneys ("the Commonwealth") in the United States District Court for the Eastern District of Virginia, challenging the

Act's constitutionality and seeking declaratory and injunctive relief to block its enforcement. The court granted the plaintiffs' motion for a preliminary injunction against enforcement of the Act on July 1, 2003. After the parties engaged in discovery, the plaintiffs filed a motion for summary judgment on September 25, 2003. On February 4, 2004, the district court granted summary judgment to the plaintiffs, declaring the Act unconstitutional and permanently enjoining its enforcement. *See Hicks*, 301 F. Supp. 2d at 517-18. The court held the Act facially invalid under the Fourteenth Amendment for several independent reasons: (1) it lacks an exception to protect a woman's health, (2) it places an undue burden on a woman's right to decide to have an abortion, (3) its life exception is inadequate, (4) it bans — in the absence of a compelling state interest — other safe gynecological procedures such as those used in certain miscarriage presentations, and (5) it is unconstitutionally vague. *Id.* at 513-17. In its order awarding summary judgment, the district court struck certain evidence proffered by the Commonwealth, specifically, the complete testimony of one expert, selected testimony of another expert, and several exhibits and other documents. The Commonwealth appeals.

## II.

The Commonwealth argues that the district court erred when it granted summary judgment to the plaintiffs on the ground that the Act is unconstitutional because it lacks an exception for the preservation of a woman's health. Summary judgment "shall be rendered forthwith" when the proffered evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We conclude that the judgment of the district court must be affirmed because "the [Supreme] Court . . . unequivocally held [in *Stenberg v. Carhart*, 530 U.S. 914 (2000)] that any ban on partial-birth abortion must include an exception for the health of the mother in order to be constitutional." *Richmond Med. Ctr. for Women v. Gilmore*, 219 F.3d 376, 377 (4th Cir. 2000) (Luttig, J., concurring).

In *Carhart* the Court concluded that Nebraska's statutory ban on certain abortion procedures, including the intact D&E/D&X procedure, violated the federal Constitution for "at least two independent reasons." 530 U.S. at 930. The statute (1) imposed "an undue burden

on a woman's ability to choose a D&E abortion, thereby unduly burdening the right to choose abortion itself" and (2) lacked "any exception for the preservation of the . . . health of the mother." *Id.* (internal quotation marks omitted). Thus, the lack of a health exception alone provides a sufficient basis for invalidating restrictions on a woman's right to have an abortion. The *Carhart* opinion explained that "the governing standard requires an exception 'where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother,' for this Court has made clear that a State may promote but not endanger a woman's health when it regulates the methods of abortion." *Id.* at 931 (quoting *Planned Parenthood v. Casey*, 505 U.S. 833, 879 (1992)). Thus, a state cannot force women to use methods of abortion that present greater risks to their health than other available methods, *see id.*, regardless of whether the fetus has reached viability, *see id.* at 930 ("Since the law requires a health exception in order to validate even a postviability abortion regulation, it at a minimum requires the same in respect to previability regulation.").

The State of Nebraska contended in *Carhart* that the intact D&E/D&X abortion procedure could be outlawed and that no health exception was necessary. The Supreme Court disagreed after conducting a wide-ranging review of medical authority evaluating the intact D&E/D&X procedure. In the course of its review, the Court supplemented the district court record with information from a significant array of medical sources. Extra-record sources considered by the Court included medical textbooks and journals relating to abortion, obstetrics, and gynecology; the factual records developed in prior "partial birth abortion" cases; and amicus briefs (with citations to medical authority) submitted on behalf of medical organizations. *See id.* at 923-29, 932-36.

Based on all of the information available, the Court concluded that substantial medical authority supports the proposition that the intact D&E/D&X procedure offers significant health and safety advantages over alternative methods of late-term abortion. First (and most important), the intact D&E/D&X procedure permits the fetus to pass through the cervix in one pass rather than several. *Id.* at 927. It therefore reduces operating time, blood loss, trauma, exposure to anesthesia, and the risk of infection; it also reduces the risk of (1) instrument-inflicted damage to the uterus and cervix and (2) injury from sharp

fetal bone fragments. *Id.* at 932, 936. Second, the procedure prevents the most common causes of maternal mortality (disseminated intravascular coagulation and amniotic fluid embolus), eliminates the possibility of serious complications arising from retained fetal tissue, and eliminates the risk of embolism of cerebral tissue into the woman's blood stream. *Id.* at 932, 935. Third, it reduces the risk of cervical injury in circumstances involving nonviable fetuses, such as fetuses with hydrocephaly, because reduction of the fetal calvarium allows a smaller diameter to pass through the woman's cervix. *Id.* at 929. Fourth, the intact D&E/D&X procedure can mitigate the special risks faced by women with prior uterine scars or for whom abortion by induction would be especially dangerous. *Id.* These factors led the Court to hold that any statute prohibiting the intact D&E/D&X procedure necessarily "creates a significant health risk" because "substantial medical authority" confirms the procedure's utility in safeguarding women's health. *Id.* at 938. Any such statute "must [therefore] contain a health exception." *Id.* The fact that the Nebraska statute — like the Act here — contained an exception to protect a woman's life had no bearing on the Court's holding that a freestanding health exception is constitutionally required. *See id.* at 921-22.

The dissent argues that the differences between the Act and the Nebraska statute are sufficient to exempt the Act from *Carhart*'s holding. *See post* at 19-21, 32-33. This argument fails because the two laws have key similarities. To begin with, the Nebraska law, like the Act, applied previability as well as postviability. *Carhart* makes clear that this "aggravates the constitutional problem presented" because a state's "interest in regulating abortion previability is considerably weaker than postviability." 530 U.S. at 930. (Again, Dr. Fitzhugh performs only previability abortions.) In addition, the Act criminalizes some of the same medical procedures (specifically, intact D&E/D&Xs) that Nebraska had criminalized, and these same procedures were the focus of the Court's attention in *Carhart*. Admittedly, Nebraska's law was broader in scope than the one we consider here: the Nebraska law was read to prohibit both D&Es by disarticulation and intact D&E/D&Xs, *see id.* at 938, whereas the Act purports to except the former from its reach, *see* Va. Code Ann. § 18.2-71.1(B). In any event, the *Carhart* Court's analysis of the health exception requirement dealt exclusively with its application to the intact D&E/D&X procedure. *See* 530 U.S. at 930-38. *Carhart* thus applied

the health exception requirement to only a subcategory of the total conduct proscribed by the Nebraska statute. Specifically, the Court addressed the question of whether a health exception was constitutionally required in the context of Nebraska's attempt to criminalize the intact D&E/D&X procedure. Justice O'Connor highlighted the Court's focus by explaining that if a statute "limited its application to the [intact D&E/]D&X procedure *and* included an exception for the . . . health of the mother, the question presented would be quite different." *Id.* at 950 (O'Connor, J., concurring) (emphasis added); *see also id.* at 948 (O'Connor, J., concurring) (explaining that "[t]his lack of a health exception necessarily renders the statute unconstitutional").

Indeed, it is not disputed in this case that the Act — like the Nebraska statute in *Carhart* — prohibits the intact D&E/D&X procedure. *See* Reply Br. of Appellants at 2 (explaining that the Act "does not allow the D&X procedure, or what is sometimes referred to as an 'intact D&E'"); *id.* at 3 (identifying "[t]he central issue in this case" as "whether [Virginia] may prevent use of the D&X or intact D&E" procedure). In the course of this medical procedure the fetus will often be "substantially expelled or extracted" from the woman's body, and the fetus will often show some "evidence of life" at the time the physician commits a "deliberate act" that is "intended to" and "does" terminate the pregnancy. Va. Code Ann. § 18.2-71.1(B), (C), (D). The dissent gets nowhere by contending that "[i]t is the killing of the fetus, not the abortion procedure," that is outlawed by the Act. *Post* at 21; *see also post* at 44 n.5 (arguing that "[t]he Nebraska statute found unconstitutional in *Carhart* . . . differs materially from the Virginia statute" because "the former proscribed certain abortion *procedures* while the latter bans only the destruction of living fetuses"). Whatever else the Act might criminalize, it most certainly criminalizes the intact D&E/D&X *procedure*. As the *Carhart* Court explained (and as we note in part I), the fetal calvarium (or skull) is collapsed during the intact D&E/D&X procedure, 530 U.S. at 927-28, and during this procedure, which results in the demise of the fetus, the fetus may not be "completely extracted or expelled" from the woman's body, Va. Code Ann. § 18.2-71.1(B). Dr. Fitzhugh performs this very procedure, which would violate the Act, as the dissent acknowledges. *See post* at 30-31.

It is also undisputed that the Act makes no provision for those situations in which the intact D&E/D&X procedure "is necessary, in

appropriate medical judgment, for the preservation of the . . . health of the mother." *Casey*, 505 U.S. at 879 (internal quotation marks omitted). This alone is enough to affirm the district court's judgment invalidating the Act because, again, any statute prohibiting the intact D&E/D&X procedure necessarily "creates a significant health risk" and therefore "must contain a health exception." *Carhart*, 530 U.S. at 938.

The Commonwealth argues that summary judgment was improper because the plaintiffs did not present substantial medical authority for the proposition that a health exception is needed in this particular statute. The district court concluded otherwise, but that is beside the point. For *Carhart* established the health exception requirement as a *per se* constitutional rule. This rule is based on substantial medical authority (from a broad array of sources) recognized by the Supreme Court, and this body of medical authority does not have to be reproduced in every subsequent challenge to a "partial birth abortion" statute lacking a health exception.[1] *See, e.g., Planned Parenthood v.*

(Text continued on page 13)

---

[1]The plaintiffs nevertheless presented medical authority in the summary judgment record that is strikingly similar to that considered by the Supreme Court in *Carhart*. For example, both Dr. Fitzhugh and Dr. Charles deProsse (the plaintiffs' expert) testified, based on their own lengthy experience in obstetrics and gynecology and on other medical sources, that the intact D&E/D&X abortion procedures prohibited by the Act are the safest and most medically appropriate for some women. Even Dr. Harlan Giles, a defense expert, testified that (1) the intact D&E/D&X as described in Dr. Fitzhugh's declaration represents a "safe and medically appropriate" procedure, and (2) physicians should be allowed the flexibility to perform the intact D&E/D&X procedure if they think to do otherwise "would endanger the woman's health." J.A. 483, 522.

In addition, an *amicus* brief was submitted to this court on behalf of a large group of physicians (over 3,400), including Physicians for Reproductive Choice and Health (PRCH), who have expertise in the field of reproductive health care and abortion procedures. These *amici* agree that the intact D&E/D&X procedure is an accepted medical procedure that is often the safest available. Br. of *Amici Curiae* PRCH et al. at 9, 12-23. They base their medical opinions on their own clinical experience and professional training, and they cite a variety of medical sources as further support. *See, e.g.,* Stephen T. Chasen et al., *Dilation and Evacuation at*

≥ *20 Weeks: Comparison of Operative Techniques*, 190 Am. J. Ob. &
Gyn. 1180, 1183 (2004) (finding that intact D&E/D&X and D&E by dis-
articulation are both safe procedures and recommending that physicians
be allowed to decide which procedure is best for any given patient based
on "intraoperative factors"); David A. Grimes, *The Continuing Need for
Late Abortions*, 280 JAMA 747, 748 (1998) (explaining that intact
D&E/D&X "may be especially useful in the presence of fetal anomalies,
such as hydrocephalus," because calvarium reduction allows "a smaller
diameter to pass through the cervix, thus reducing risk of cervical
injury," while also allowing the physician to retain greater surgical con-
trol); Maureen Paul, et al., A CLINICIAN'S GUIDE TO MEDICAL AND SURGICAL
ABORTION 133-35 (1999) (noting that physicians often must compress or
collapse the fetal calvarium to facilitate removal through the cervix).

In contrast, the Commonwealth proffered in the summary judgment
proceedings the testimony of two expert (physician) witnesses who
offered the opinion that no maternal health exception is necessary here.
In addition, the Commonwealth proffered supporting materials from the
Congressional Record that included the committee testimony of an
OB/GYN professor. The district court excluded all of one expert's testi-
mony and selected portions of the other's, concluding that it was unreli-
able and inadmissible under *Kumho Tire Co. v. Carmichael*, 526 U.S.
137 (1999), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.
579 (1993). *See Hicks*, 301 F. Supp. 2d at 511-12. The materials from
the Congressional Record were excluded as inadmissible hearsay. *See id.*
at 512. Even if we assumed without deciding that the district court
abused its discretion in excluding the Commonwealth's opinion evi-
dence, the consideration of that evidence would not change our result.
The Commonwealth's evidence would at most indicate some division of
medical opinion on the question of whether "banning [the intact
D&E/D&X] procedure could endanger women's health." *Carhart*, 530
U.S. at 938. As the Court emphasized in *Carhart*, "unanimity of medical
opinion" is not required because a

> division of medical opinion . . . at most means uncertainty, a fac-
> tor that signals the presence of risk, not its absence. . . . Where
> a significant body of medical opinion believes a procedure may
> bring with it greater safety for some patients and explains the
> medical reasons supporting that view, we cannot say that the
> presence of a different view by itself proves the contrary. Rather,
> the uncertainty means a significant likelihood that those who

*Heed*, 390 F.3d 53, 59 (1st Cir. 2004) (explaining that even a parental notification statute "must contain a health exception in order to survive constitutional challenge"), *cert. granted sub nom. Ayotte v. Planned Parenthood*, ___ S.Ct. ___, 2005 WL 483164 (May 23, 2005); *Planned Parenthood v. Wasden*, 376 F.3d 908, 922 (9th Cir. 2004) (characterizing health exception as "a *per se* constitutional requirement"), *cert. denied*, 125 S.Ct. 1694 (Mar. 28, 2005); *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 444-45 (6th Cir. 2003) (explaining that *Casey* and *Carhart* require a health exception); *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 688 (7th Cir. 2002) (noting that *Carhart* Court was "of the view . . . that [the] constitutionality [of laws regulating abortion] must be assessed at the level of legislative fact, rather than adjudicative fact determined by more than 650 district judges. Only treating the matter as one of legislative fact produces the nationally uniform approach that [*Carhart*] demands."); *Planned Parenthood v. Owens*, 287 F.3d 910, 918 (10th Cir. 2002) (explaining that *Carhart* requires "state abortion regulations [to] provide an exception for the protection of the health of pregnant women"); *Reproductive Health Servs. of Planned Parenthood v. Nixon*, 325 F. Supp. 2d 991, 994-95 (W.D. Mo. 2004) (invalidating "partial birth abortion" statute "[b]ecause there are no genuine issues of material fact as to the presence of a health exception, [which requires the] Court, pursuant to *Stenberg v. Carhart*, [to] conclude that the [statute] is unconstitutional"); *Planned Parenthood Fed'n of Am. v. Ashcroft*, 320 F. Supp. 2d 957, 1013 (N.D. Cal. 2004) (noting that *Carhart* dispels characterization of the health exception inquiry "as one of pure fact, limited to the record in [the] particular case"); *WomanCare, P.C. v. Granholm*, 143 F. Supp. 2d 849, 855 (E.D. Mich. 2001) (invalidating "partial birth abortion" statute because "there are no genuine issues of material fact, with respect to the lack of a health exception in the statute" and because the Supreme Court's decision in *Carhart* is "controlling"); *Summit Med. Assocs. v.*

---

believe that [intact D&E/]D&X is a safer abortion method in certain circumstances may turn out to be right. If so, then the absence of a health exception will place women at an unnecessary risk of tragic health consequences. If they are wrong, the exception will simply turn out to have been unnecessary.

*Id.* at 937.

*Siegelman*, 130 F. Supp. 2d 1307, 1309, 1314 (M.D. Ala. 2001) (invalidating "partial birth abortion" statute "on the pleadings" and concluding that it was unconstitutional under *Carhart* "[f]or its lack of a health-exception alone"); *Daniel v. Underwood*, 102 F. Supp. 2d 680, 681, 684 (S.D. W.Va. 2000) (concluding that the state's "ban on 'partial-birth abortion' fails to provide an exception for the preservation of the health of the woman and therefore violates the United States Constitution" and explaining that *Carhart* "compels th[is] conclusion").

In sum, *Carhart* has already established, based on substantial medical authority, that a statute prohibiting the intact D&E/D&X abortion procedure necessarily "creates a significant health risk" and "must [therefore] contain a health exception." 530 U.S. at 938. Because the Act lacks a health exception, it is unconstitutional on its face.

III.

The Commonwealth also argues that the district court erred in failing to apply the proper standard for reviewing facial challenges alleging overbreadth. According to the Commonwealth, the court should have applied the standard set forth in *United States v. Salerno*, 481 U.S. 739 (1987). There, the Supreme Court said that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745. The plaintiffs counter that the proper approach is that used by the Supreme Court in *Carhart*, where the Court — without applying *Salerno*'s "no set of circumstances" test — held that the Nebraska statute banning certain abortion procedures was unconstitutional on its face because it lacked a health exception. *See Carhart*, 530 U.S. at 930-38. We conclude, for the following reasons, that *Salerno* does not govern a facial challenge to a statute regulating abortion.

First, in *Carhart* the Supreme Court "without so much as a mention of *Salerno* . . . held invalid, in a pre-enforcement challenge, an abortion statute that might . . . have [had] at least some [constitutional] applications." *Newman*, 305 F.3d at 687. Earlier, the Court in *Casey* had similarly disregarded *Salerno*. As a result, seven circuits have concluded that *Salerno* does not govern facial challenges to abortion

regulations. *See Heed*, 390 F.3d at 58-59; *Newman*, 305 F.3d at 687; *Planned Parenthood v. Farmer*, 220 F.3d 127, 142 (3d Cir. 2000); *Planned Parenthood v. Lawall*, 180 F.3d 1022, 1027 (9th Cir. 1999), *amended by* 193 F.3d 1042 (1999); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir. 1997); *Jane L. v. Bangerter*, 102 F.3d 1112, 1116 (10th Cir. 1996); *Planned Parenthood v. Miller*, 63 F.3d 1452, 1458 (8th Cir. 1995). Only the Fifth Circuit has suggested otherwise, but even that circuit's cases are inconsistent. *Compare Sojourner T v. Edwards*, 974 F.2d 27, 30 (5th Cir. 1992) (applying *Casey*'s undue burden test without reference to *Salerno*), *with Barnes v. Moore*, 970 F.2d 12, 14 & n.2 (5th Cir. 1992) (per curiam) (applying *Salerno* to a facial attack on an abortion regulation).

Second, contrary to the Commonwealth's suggestion, the question of *Salerno*'s applicability in the abortion context has not been squarely confronted by this court. The Commonwealth claims that in *Manning v. Hunt*, 119 F.3d 254 (4th Cir. 1997), we "ruled that *Salerno* survived *Casey*." Br. of Appellants at 15. The parties in *Manning*, however, had not asked us "to decide that the District Court improperly applied the *Salerno* standard for review of facial challenges," and we therefore concluded that the issue was not properly before us. *Manning*, 119 F.3d at 268 n.4. Moreover, in *Planned Parenthood v. Camblos*, 155 F.3d 352, 359 n.1 (4th Cir. 1998) (en banc), our full court specifically declined to decide whether to apply *Salerno* to statutes regulating abortion. There, we characterized "*Manning*['s suggestion] that the *Salerno* standard remains the governing standard until the Supreme Court explicitly holds otherwise" as "dicta." *Id.* at 381 n.14. Later, in *Greenville Women's Clinic v. Bryant*, 222 F.3d 157 (4th Cir. 2000) (*Greenville I*), we again declined to resolve the question, holding that various aspects of a South Carolina regulation establishing standards for licensing abortion clinics were constitutional under either the *Casey* or *Salerno* standard for reviewing a facial challenge. *See id.* at 165 (concluding that the regulation at issue survived "[e]ven when we apply [the standard from *Casey*,] a less deferential standard than that articulated in *Salerno*"). In *Greenville Women's Clinic v. Commissioner*, 317 F.3d 357 (4th Cir. 2002) (*Greenville II*), we addressed further aspects of the facial challenge to the South Carolina abortion clinic licensing standards. We used the *Salerno* test there, but only in the context of reviewing a claim that

the regulatory scheme allowed for the standardless delegation of medical licensing authority to third parties in violation of *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). *See Greenville II*, 317 F.3d at 361-63; *id.* at 372 & n.4 (King, J., dissenting).

Third, the recent case of *Sabri v. United States*, 124 S.Ct. 1941, 1948-49 (2004), puts the issue to rest by recognizing the appropriateness of facial challenges alleging overbreadth in the regulation of abortion. In *Sabri* the Supreme Court recognized that facial attacks are appropriate in only "limited settings" that include challenges to laws restricting abortion. *Id.* at 1949. In rejecting a criminal defendant's facial challenge to a federal bribery statute, the Court noted that facial challenges are to be discouraged because "they invite judgments on fact-poor records" and "call for relaxing familiar requirements of standing." *Id.* at 1948. Nevertheless, the Court stated that it had "recognized the validity of facial attacks alleging overbreadth . . . in relatively few settings," and these include challenges to abortion regulations. *Id.* (citing *Carhart*). Thus, *Sabri* makes clear that *Salerno*'s "no set of circumstances" standard does not apply in the context of a facial challenge, like the one here, to a statute regulating a woman's access to abortion.

## IV.

As Justice O'Connor has said, "[t]he issue of abortion is one of the most contentious and controversial in contemporary American society. It presents extraordinarily difficult questions that . . . involve 'virtually irreconcilable points of view.'" *Carhart*, 530 U.S. at 947 (O'Connor, J., concurring) (quoting opinion of the Court, *id.* at 921). These questions are difficult and sensitive to be sure, but that does not give the dissent free license to accuse us of "tarring [liberty] with the color of political ideology," *post* at 43, "assert[ing] vacuously that we are doing what the Supreme Court commands," *post* at 44, deciding this case based on "personal convenience," *post* at 45, disregarding "the mind's sense of right," *post* at 44, and "disconnecting our law from accepted moral norms," *post* at 43. No matter what the dissent says, the simple truth is that we affirm the district court's order striking down the Act for a single reason: the "lack of a health exception necessarily renders the [Act] unconstitutional." *Carhart*, 530 U.S. at 948 (O'Connor, J., concurring).

A woman's interest in protecting her health is at the core of her "constitutional liberty . . . to have some freedom to terminate her pregnancy." *Casey*, 505 U.S. at 869. This enduring principle — which the dissent either ignores or minimizes — was recognized in *Roe v. Wade*, the case in which the Supreme Court struck down a Texas abortion statute "that except[ed] from criminality only a *life-saving* procedure on behalf of the mother." 410 U.S. 113, 164 (1973). The *Roe* opinion also recognized that a state has an "interest in the potentiality of human life." *Id.* But even when this interest is at its highest point (subsequent to viability), a state may regulate or proscribe abortion only if it provides an exception for instances "where it is necessary, in appropriate medical judgment, for the preservation of the . . . health of the mother." *Id.* at 165. This constitutional principle was expressly reaffirmed by the Court in *Casey*, 505 U.S. at 846, 879, and reinforced in *Carhart*, 530 U.S. at 921.

We acknowledge, as did the Supreme Court in *Casey*, that "[m]en and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy." 505 U.S. at 850. But even if "abortion [is] offensive to our most basic principles of morality . . . that cannot control our decision," for our obligation is to apply the Supreme Court's definition of personal liberty, "not to mandate our own moral code." *Id.* Thus, we are bound today to apply *Carhart*'s constitutional rule that any ban on "partial birth abortion" must include an exception to protect a woman's health. We have been forewarned by the Court that "[s]ome cost will be paid by anyone who approves or implements a constitutional decision where it is unpopular, or who refuses to work to undermine the decision or to force its reversal. The price may be criticism or ostracism, or it may be violence." *Id.* at 867. The Court further warned that "[a]n extra price will be paid by those who themselves disapprove of the decision's results when viewed outside of constitutional terms, but who nevertheless struggle to accept it, because they respect the rule of law." *Id.* at 867-68. These words have special resonance in today's climate, and they serve to remind us of the critical importance of our obligation to follow faithfully the decisions of the Supreme Court.

V.

Because the Virginia Act does not contain an exception for circumstances when the banned abortion procedures are necessary to preserve a woman's health, we affirm the summary judgment order declaring the Act unconstitutional on its face. We likewise affirm the permanent injunction against enforcement of the Act.[2]

*AFFIRMED*

NIEMEYER, Circuit Judge, dissenting:

The Commonwealth of Virginia enacted a law in 2003, making it a criminal offense to kill a "human infant who has been born alive, but who has not been completely extracted or expelled from its mother." Va. Code Ann. § 18.2-71.1(B). The statute applies to protect only a live fetus that has been delivered halfway into the world — i.e., either "the infant's entire head is outside the body of the mother" or, for a breech delivery, "any part of the infant's trunk past the navel is outside the body of the mother." *Id.* § 18.2-71.1(D). In enacting this narrow provision, Virginia focused on preserving the life of infants and distinguishing its law from the Nebraska statute struck down as unconstitutional in *Stenberg v. Carhart*, 530 U.S. 914 (2000), that prohibited an array of abortion *methods*.

Without recognizing the differences between the Nebraska statute and the Virginia statute and without taking into account the facts before this court, the panel majority reads *Carhart* to create a *per se* constitutional rule that requires any ban on partial-birth abortion to contain language protecting the health of the mother, regardless of the scope of the law, the nature of the relevant facts, and the actual need for a health exception. By so extending *Carhart* and applying a *per se* rule, the majority mechanically strikes down the Virginia statute as unconstitutional, without further analysis.

---

[2]Because the Act is invalid for its lack of a health exception, we decline to address the district court's alternative grounds for striking it down. For this same reason, it is unnecessary for us to consider the Commonwealth's other arguments.

In addition, to strike down Virginia's statute on a facial challenge, the majority found it necessary to disregard our established standard for reviewing facial challenges of abortion laws in favor of a more liberal standard of review.

The majority's opinion is a bold, new law that, in essence, constitutionalizes infanticide of a most gruesome nature. The plaintiff Dr. William Fitzhugh, an abortionist, sought, through this lawsuit, to protect his ability to perform abortions by crushing infants' skulls or dismembering their limbs when they are inches away from being fully delivered alive without injury to the infant or to the mother. In his words, "My job on any given patient is to terminate that pregnancy, which means that I don't want a live birth." By expanding abortion rights to this extent, the majority unnecessarily distances our jurisprudence from that of the Supreme Court and from general norms of morality. I profoundly dissent from today's decision.

I

By casting *Carhart*'s holding in the most general terms — that a State may not prohibit partial birth abortions without providing an exception for the health of the mother — the majority rejects Virginia's contention that the plaintiffs in this case did not present "substantial medical authority for the proposition that a health exception is needed in this particular statute." The majority reasons that "*Carhart* established the health exception requirement as a *per se* constitutional rule," *ante* at 11, and accordingly holds that "[b]ecause the Act lacks a health exception, it is unconstitutional on its face," *ante* at 14. This gross application of *Carhart* fails to take into account the nature of the Nebraska statute under consideration in *Carhart*, the factual findings on which the Supreme Court based its opinion, and the reach of the Supreme Court's actual holding.

Deferring momentarily the discussion of whether *Carhart* created a *per se* constitutional rule that statutes like the Nebraska statute must have a health exception, the Virginia statute is sufficiently different from the Nebraska statute that any would-be *per se* rule does not apply to it. The statute in *Carhart* provided that "[n]o partial birth abortion shall be performed in this state," except to save the life of the mother. *Carhart*, 530 U.S. at 921 (quoting Neb. Rev. Stat. § 28-

328(1)) (internal quotation marks omitted). The Supreme Court read the Nebraska statute to prohibit an array of abortion *methods* that included both "dilation and evacuation" ("D&E") and "dilation and extraction" ("D&X"). *See id.* at 938. D&E generally refers to destruction of the fetus in the uterus and removal of the destroyed and even dismembered fetus, while D&X generally refers to delivery of the fetus into the vagina in whole or in part and then destroying it, generally by sucking out the contents of the fetus' skull or by crushing the skull. Important to the case before us, the Supreme Court summarized the scope of the Nebraska law by stating that it "of course, does not directly further an interest 'in the potentiality of human life' by saving the fetus in question from destruction, as it regulates only a *method* of performing abortion." *Id.* at 930 (Supreme Court's emphasis).

Unlike the Nebraska statute, the Virginia statute protects the fetus itself, by prohibiting its destruction when it has been delivered alive into the world or at least halfway into the world. Also in contrast to the Nebraska statute, which only prohibited abortion procedures, the Virginia statute excepts from its coverage various abortion methods prohibited by the Nebraska statute[1] and limits itself to protecting the fetus by prohibiting the killing of a "human infant who has been born alive, but who has not been completely extracted or expelled from its mother . . . regardless of whether death occurs before or after extraction or expulsion from its mother has been completed." Va. Code Ann. § 18.2-71.1(B). Yet, it is only by assuming that the Virginia statute is the same as the Nebraska statute that the majority is able to strike down the Virginia statute using its *per se* analysis.

The majority repeatedly characterizes the Virginia statute as ban-

---

[1]The relevant portion of the Virginia statute excludes from the statutory coverage

> (i) the suction curettage abortion procedure, (ii) the suction aspiration abortion procedure, (iii) the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother, [and] (iv) completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.

Va. Code Ann. § 18.2-71.1(B).

ning abortion *procedures*, including the "intact D&E/D&X proce-
dure," *ante* at 9-10, *see also ante* at 5, 6, 10-11, and, relying on that
characterization, analogizes the Virginia statute to the unconstitu-
tional Nebraska statute, which the Supreme Court interpreted to pro-
hibit abortion *procedures*. By employing the analogy, the majority is
thus able to argue that in prohibiting what might sometimes be the
safest partial birth abortion *procedure* — the "intact D&E/D&X pro-
cedure" — Virginia infringes a woman's right to obtain a safe abor-
tion. *Ante* at 9-11.

The majority overlooks, however, that if the fetus is not deliber-
ately destroyed during an "intact D&E/D&X procedure," and it need
not be to complete the procedure, Virginia's statute, unlike Nebras-
ka's statute, does not prohibit the procedure. It is the killing of the
fetus, not the abortion procedure, that is the concern of Virginia's
statute. And while prohibiting a safe procedure increases a woman's
health risks, no one has contended that banning the destruction of a
fetus after an intact delivery implicates the mother's health at all.
Rather than address this distinction directly, the majority asserts that
the Virginia statute bans the intact D&E/D&X procedure because "the
fetal calvarium (or skull) is collapsed during [that] procedure." *Ante*
at 10. Such a simplistic view of the statute and abortion procedures
fails to account for the Commonwealth's evidence that crushing the
fetal skull is necessary neither to terminate a pregnancy after an intact
delivery nor to obtain the purported safety advantages of the intact
D&E/D&X procedure.

In addition to relying on the incorrect assumption that the Virginia
statute is identical to the statute at issue in *Carhart*, the majority's
analysis also depends on the unsupportable premise that *Carhart* cre-
ated a *per se* constitutional rule. Correctly noting that *Carhart* holds
that a "state cannot force women to use methods of abortion that pre-
sent greater risks to their health than other available methods," *ante*
at 8, the majority goes on to affirm the district court's opinion without
assessing whether the Virginia statute would in fact force women to
use riskier methods of abortion. In response to Virginia's defense that
the plaintiffs in this case did not present "substantial medical author-
ity for the proposition that a health exception is needed in this particu-
lar statute," *ante* at 11, the majority states that such a consideration

is irrelevant because "*Carhart* establishes the health exception requirement as a *per se* constitutional rule," *ante* at 11.

Nothing in *Carhart*, however, indicates that the Court was creating a *per se* constitutional rule or that every abortion statute, regardless of whether it targets methods of abortion or the life of the fetus or some other state interest, must contain a clause that provides for the protection of the mother's health. To read *Carhart* so superficially loses focus of the protection being implemented there. As the *Carhart* Court said, "We shall not revisit those legal principles [providing basic protection to the mother's right to choose]. Rather, we apply them *to the circumstances of this case*." 530 U.S. at 921 (emphasis added). And, of course, the Court thus rendered its holding on the underlying principle being implemented: that a State cannot "interfere with a woman's choice to undergo an abortion procedure *if continuing her pregnancy would constitute a threat to her health*." *Planned Parenthood v. Casey*, 505 U.S. 833, 880 (1992) (emphasis added) (citing *Roe v. Wade*, 410 U.S. 113, 164 (1973)).

Moreover, in *Carhart* there was a full trial in which the district court made findings of fact and then considered how the Nebraska statute and the Constitution applied to those facts. In explicitly declining to conduct a facial review of the statute, the district court found itself unprepared to conclude that the law was unconstitutional "regardless of how it might be applied to a particular plaintiff," because such an inquiry would entail too many "unknown" factual circumstances. *Carhart v. Stenberg*, 11 F. Supp. 2d 1099, 1119-20 (D. Neb. 1998). The Supreme Court drew upon the district court's findings, as well as "related medical texts," and applied established preexisting abortion jurisprudence to that record. *See Carhart*, 530 U.S. at 923-29. Indeed in responding to Nebraska's argument, like Virginia's here, that "safe alternatives remain available" and that a "ban . . . would create no risk to the health of women," the Supreme Court responded, not as the majority suggests here by applying a *per se* rule, but by noting,

> The problem for Nebraska is that the parties strongly contested this factual question in the trial court below; and the findings and evidence support Dr. Carhart.

*Id.* at 931-32. That the Supreme Court did not create a *per se* rule is further fortified by its statement of its holding, which inherently precludes such a conclusion:

> The upshot is a District Court finding that D&X significantly obviates health risks in certain circumstances, *a highly plausible record-based explanation* of why that might be so, a division of opinion among some medical experts over whether D&X is generally safer, and an absence of controlled medical studies that would help answer these medical questions. *Given these medically related evidentiary circumstances*, we believe the law requires a health exception.

*Id.* at 936-37 (emphasis added).

Quite apart from considering the actual nature of the Supreme Court's holding in *Carhart*, the majority elects to rely on five circuit court cases that it contends support its conclusion that *Carhart* created a *per se* rule. *See ante* at 11-14. Even without conducting a full analysis of those nonbinding decisions for their faithfulness to *Carhart*, it becomes readily apparent that the support each provides is nil or little.

Only one of the five circuit court cases cited by the majority stands for the proposition that *Carhart* established a *per se* constitutional rule that obviated the need to examine medical authority in abortion cases. *See Planned Parenthood v. Heed*, 390 F.3d 53, 59 (1st Cir. 2004) (invalidating a parental notification law due to its lack of a health exception), *cert. granted sub nom. Ayotte v. Planned Parenthood*, ___ S.Ct. ___, 2005 WL 483164 (May 23, 2005). Yet, the holding of that case — that *all* statutes "regulating abortion must contain a health exception in order to survive constitutional challenge," *id.* — can hardly be considered a faithful interpretation of *Carhart*, which even under the majority's expansive reading, created a *per se* rule only for *partial birth abortion* laws.

The majority avoids providing any context for the remainder of its citations presumably because closer inspection reveals that — far from treating *Carhart* as establishing a *per se* constitutional rule — the only circuit court cases to have directly addressed the question

have found a health exception to be necessary only after considering evidence introduced by the parties. In *A Woman's Choice — Eastside Women's Clinic v. Newman*, 305 F.3d 684, 688 (7th Cir. 2002), the Seventh Circuit did indeed observe that the Supreme Court had previously treated the necessity of a health exception as a question of legislative fact, but then went on to explain why it was *not* following that approach:

> Because the Supreme Court has not made this point explicit, however, and because the undue-burden approach does not prescribe a choice between the legislative-fact and the adjudicative-fact approaches, we think it appropriate to review the evidence in this record and the inferences that properly may be drawn at the pre-enforcement stage.

*Id.* at 688-89.

The majority's truncation of the sentence it lifts from the Tenth Circuit's opinion in *Planned Parenthood v. Owens*, 287 F.3d 910 (10th Cir. 2002), similarly creates the misimpression that that circuit treats *Carhart* as a *per se* constitutional rule. Read in full, the sentence quoted by the majority states: "Thus, the current state of the law is that state abortion regulations must provide an exception for the protection of the health of pregnant women *where those regulations might otherwise infringe on their ability to protect their health through an abortion*." *Id.* at 918 (emphasis added to the portion omitted from the majority's opinion). The second half of the sentence clarifies the court's understanding that *Carhart* does not require a health exception in all abortion regulations, but only in those that might endanger a woman's health. And, that clarification explains why the Tenth Circuit deemed it necessary to examine the evidence contained in the record before finding that "there [was] no genuine issue as to the material fact that the [statute] infringe[d] on the ability of pregnant women to protect their health." *Id.* at 920.

The remaining two circuit court cases cited by the majority — *Planned Parenthood v. Wasden*, 376 F.3d 908 (9th Cir. 2004), and *Women's Medical Professional Corp. v. Taft*, 353 F.3d 436 (6th Cir. 2003) — similarly do not stand for the proposition for which the majority cites them. *Wasden* addressed the question of whether a reg-

ulation "must contain adequate provision for a woman to terminate her pregnancy if it poses a threat to her life or health," 376 F.3d at 922, not the distinct question, raised by partial-birth abortion bans, of whether a statute that regulates some aspect of abortion procedure but does not prevent a woman from terminating her pregnancy must contain a health exception. And, while *Taft* did address a partial-birth abortion ban, the particular statute at issue there already contained a health exception, and neither party argued that a health exception was unnecessary. 353 F.3d at 444-45. The only question, which the court answered in the affirmative, was whether the statute's health exception was constitutionally adequate. *Id.* at 450.

Perhaps recognizing the scant support for its *per se* rule among our sister circuits, the majority resorts to citing a handful of apparently randomly selected district court opinions. *See ante* at 11-14. A more thorough survey of the case law reveals a roughly even split between district courts that interpret *Carhart* to have established a *per se* rule and those that interpret *Carhart* to require a health exception only if the record demonstrates that the regulation at issue might endanger a woman's health. *Compare Reproductive Health Servs. of Planned Parenthood v. Nixon*, 325 F. Supp. 2d 991, 994 (W.D. Mo. 2004) (striking down a state partial birth abortion ban for lack of a health exception without examining evidence in the record); *WomanCare, P.C. v. Granholm*, 143 F. Supp. 2d 849, 854-55 (E.D. Mich. 2001) (same); *Summit Med. Assocs. v. Siegelman*, 130 F. Supp. 2d 1307, 1314 (M.D. Ala. 2001) (relying on *Carhart*'s factual findings to strike down a state partial birth abortion ban), *with Carhart v. Ashcroft*, 331 F. Supp. 2d 805 (D. Neb. 2004) (striking down the Federal Partial-Birth Abortion Ban Act of 2003 in a 269-page opinion, in which the court weighed the evidence presented during the course of a two-week trial); *Nat'l Abortion Fed'n v. Ashcroft*, 330 F. Supp. 2d 436, 442, 482 (S.D.N.Y. 2004) (finding the Federal Partial-Birth Abortion Ban unconstitutional for lack of a health exception because the evidence adduced during a sixteen-day bench trial demonstrated that "a significant body of medical opinion" supported the proposition that the ban would endanger a woman's health); *Planned Parenthood Fed'n of Am. v. Ashcroft*, 320 F. Supp. 2d 957, 1012-13, 1033 (N.D. Cal. 2004) (holding that "*Stenberg*'s health exception requirement does not appear to arise to the level of a constitutional 'rule' like *Miranda* requirements" and finding it necessary to examine the record

before determining whether "significant medical authority supports the proposition that in some cases, [intact D&E] is the safest procedure" (internal quotation marks and citation omitted)); *Daniel v. Underwood*, 102 F. Supp. 2d 680, 684-85 (S.D. W. Va. 2000) (examining evidence submitted by the parties before concluding that West Virginia's partial birth abortion ban "create[d] a significant health risk" and therefore had to provide a health exception). In short, the majority's ten-case-long string cite cannot disguise the fact that the weight of authority does not support its interpretation of *Carhart*.

## II

In addition to its mechanical application of a *per se* rule, which the majority unjustifiably creates, the majority also ignores this circuit's existing standard for facial challenges of abortion statutes. *See Greenville Women's Clinic v. Commissioner* ("*Greenville Women's Clinic II*"), 317 F.3d 357, 362 (4th Cir. 2002); *Greenville Women's Clinic v. Bryant* ("*Greenville Women's Clinic I*"), 222 F.3d 157, 165 (4th Cir. 2000); *Manning v. Hunt*, 119 F.3d 254, 268-69 (4th Cir. 1997). It finds that our "standard does not apply in the context of a facial challenge . . . to a statute regulating a woman's access to abortion." *Ante* at 16. In attempting to limit or distinguish our rule and apply one that is more liberal for its purposes, the majority unapologetically violates the well-established rule that one panel of this court may not overrule another. *See United States v. Prince-Oyibo*, 320 F.3d 494, 498 (4th Cir. 2003); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 n.2 (4th Cir. 2002).

The standard articulated by the Supreme Court in *United States v. Salerno*, 481 U.S. 739 (1987), for facial challenges of statutes provides: "A facial challenge to a legislative act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745; *see also Rust v. Sullivan*, 500 U.S. 173, 183 (1991) (explaining that a facial challenge will fail if an act "can be construed in such a manner that [it] can be applied to a set of individuals without infringing upon constitutionally protected rights"). This standard stems from the fact that we are courts exercising *judicial* power over actual cases, and not super-legislatures reviewing legislative acts in the abstract. And this circuit has applied the *Salerno*

standard to facial reviews of abortion statutes in three cases that have not been overturned by either the Supreme Court or this court sitting *en banc*. *See Greenville Women's Clinic II*, 317 F.3d at 362; *Greenville Women's Clinic I*, 222 F.3d at 165; *Manning*, 119 F.3d at 268-69. To avoid applying this standard and thereby being required to uphold the constitutionality of Virginia's infanticide statute, the majority unjustifiably turns aside the binding precedents of this court.

*First*, it explains that in *Manning*, we did not decide the issue, because "the issue was not properly before us." *Ante* at 15. In *Manning*, we reviewed the district court's denial of the plaintiff's claim that facially challenged North Carolina's Act to Require Parental or Judicial Consent for an Unemancipated Minor's Abortion. In conducting our review, we said, "Because this is a facial challenge, appellants carry a heavy burden," and we then set forth and cited the *Salerno* standard. *Manning*, 119 F.3d at 268. We noted that the district court had applied the *Salerno* standard and that the challengers to the statute did not take exception to that standard on appeal. Accordingly, we applied the *Salerno* standard in our holding:

> Thus, in order to succeed, Appellants are required to show that under no set of circumstances can the Act be applied in a manner which is not an undue burden on an unemancipated pregnant minor's right to obtain an abortion.

*Id.* at 268-69. *Salerno* therefore was the standard that we explicitly applied in *Manning*, and the finding of that standard was *necessary* to our ruling rejecting the plaintiff's facial challenge of the statute. How the majority can conclude that this was not a decision of our court is baffling. The majority apparently has found comfort in quoting a portion of one sentence in footnote 4 of that opinion that indicated that the applicability of *Salerno* to facial challenges of abortion regulations was "not [then] properly before the court." But it could not have relied on even that explanatory statement without reading further into the footnote. After noting that the standard of review was not challenged by the statute's challengers and therefore was not placed before us, we nonetheless recognized that we had to apply a standard of review. And we said further on in footnote 4:

> At the moment, the most that can be said is that three Justices have indicated a desire to [overrule application of

*Salerno*]. Until the Supreme Court specifically does so, though, *this Court is bound to apply the Salerno standard* as it has been repeatedly applied in the context of other abortion regulations reviewed by the Supreme Court.

*Id.* at 268 n.4 (emphasis added).

Were the holding in *Manning* not clear, however, — and the majority apparently concludes that it was not because we decided the case on a standard that was not challenged by the parties — our decision in *Greenville Women's Clinic I*, put the question to rest. There, discussing the holding of *Manning* at some length, we stated:

> While we believe that the observation in *Manning was part of the court's holding* because application of *Salerno* was necessary to the ruling in that case and not dictum, we add the observation that the logic of the *Salerno* test is necessary to show deference to legislatures, particularly in light of the limitation imposed by Article III of the Constitution that the judiciary act only in cases and controversies. *See* U.S. Const. art. III, § 2. As we explain below, when the abortion clinics are confronted with *Salerno*'s requirement that no set of circumstances exists under which Regulation 61-12 would be valid, they fail, if for no other reason, because the impact on the Greenville Women's Clinic is so modest.

222 F.3d at 165 (emphasis added). We not only held that *Manning did* decide the proper standard to apply, but we again applied that standard in *Greenville Women's Clinic I*. The majority insists that we rendered an alternative ruling under the more liberal standard. But a closer reading of *Greenville Women's Clinic I* reveals that we rendered our principal (and therefore binding) holding under the *Salerno* standard. Our hypothetical application of the more liberal standard served only to underscore the inherent weakness of the plaintiffs' claims. *See id.*

Finally, seeking to distinguish *Greenville Women's Clinic II*, the majority states that "[w]e used the *Salerno* test there, but only in the context of reviewing a claim that the regulatory scheme allowed for the standardless delegation of medical licensing authority to third par-

ties in violation of *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)." *Ante* at 15. The review in that case, though, was a continuation of the review begun in *Greenville Women's Clinic I*, and we so stated:

> This appeal continues our review of the facial constitutional challenges made by abortion clinics in South Carolina to Regulation 61-12 of the South Carolina Department of Health and Environmental Control, establishing standards for licensing abortion clinics.

317 F.3d at 359. We then held *directly and explicitly*, clarifying that which was our principal holding in *Greenville Women's Clinic I*, that the *Salerno* standard applies to the facial challenge of an abortion regulation:

> We begin by emphasizing, as we did in [*Greenville Women's Clinic I*], that the challenge to Regulation 61-12 [South Carolina's abortion regulation] is a facial one and therefore "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). To show the necessary respect to legislative departments, particularly in light of Article III's limitation of judicial power to cases and controversies, we require evidence — as opposed to speculation — sufficient to rebut the regulation's presumptive constitutionality. Yet, in this record, we find only speculation.

*Id.* at 362.

Had the majority conducted its review under the *only* standard legally established in our circuit for facial review of abortion statutes, it would have found itself compelled, in view of the record in this case, to conclude that Virginia's infanticide statute is constitutional. To achieve its contrary ruling, the majority trampled not only the precedents establishing the applicability of the *Salerno* standard but also the precedents establishing that one panel of our court may not overrule another. *See Prince-Oyibo*, 320 F.3d at 498; *Scotts Co.*, 315 F.3d at 271 n.2.

III

The underlying principles guaranteeing a woman's conditional right to choose an abortion were not altered by the holding in *Carhart*, as the *Carhart* Court expressly noted. *See* 530 U.S. at 921. And it is useful to keep at hand the nature of the right applied in *Carhart* when considering the Virginia statute in this case.

Before viability of a fetus, a "woman has a right to choose to terminate her pregnancy," and if a statute unduly burdens that decision, it is unconstitutional. *Id.* (citation and internal quotation marks omitted). After viability, the State, in protecting its legitimate interest in potential life, may "regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* (citation and internal quotation marks omitted).

In *Carhart*, the Nebraska statute was found to prohibit a range of abortion procedures employed by doctors at various stages of fetal growth and for various conditions confronted by the doctor at the time the abortion is conducted. Taking into account the factual record and related medical texts, the Supreme Court concluded, "where substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health" and there is a "highly plausible record-based explanation for why that might be so," the Constitution "requires the statute to include a health exception where the procedure is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Carhart*, 530 U.S. at 936, 938 (citation and internal quotation marks omitted).

In the case before us, Dr. Fitzhugh and the Richmond Medical Center for Women, of which he is the founder, owner, and medical director[2] (referred to collectively or individually as "Dr. Fitzhugh"),

---

[2]Dr. Fitzhugh is board certified in obstetrics and gynecology, and as part of his practice, he performs over 200 second-trimester abortions each year at hospitals in Richmond and Henrico County, Virginia. The Richmond Medical Center for Women was founded "to provide abortion services," and it operates clinics in Richmond and Roanoke, at which physicians perform first-trimester abortions.

have attempted to create a record similar to that created in *Carhart*. Recognizing that the Virginia statute addresses only abortion procedures in which a live fetus has substantially or completely emerged from its mother and excepts from its coverage a broad range of procedures proscribed by the Nebraska statute in *Carhart*, Dr. Fitzhugh still complains about two procedures that he contends are improperly prohibited by the Virginia statute. *First*, he correctly asserts that the statute prohibits killing the fetus after it is fully delivered through the cervix intact, sometimes head first. As Dr. Fitzhugh testified, "In such circumstances, I might need to collapse the calvarium (skull) of the fetus in order to complete the procedure." Arguing that an intact delivery is often the safest abortion method, Dr. Fitzhugh contends that the Constitution prohibits Virginia from banning the destruction of the fetus in these circumstances without a health exception.

*Second*, Dr. Fitzhugh claims that the statute also impermissibly limits his ability to complete an abortion involving a feet-first delivery where the head of the fetus becomes lodged in the woman's cervix. In such a scenario, Dr. Fitzhugh states that he crushes the fetus' skull, or collapses it by sucking out its contents, and then completes the delivery of the fetus. He correctly states that by performing this procedure he would violate the statute by killing the fetus after its feet and body had come through the woman's cervix.

Under Dr. Fitzhugh's first scenario for objecting to the Virginia statute, the mother's health is not brought into play at all. The live intact fetus is delivered into the vagina or beyond, and whether it is destroyed after reaching that stage does not affect the mother's health. As Dr. Charles deProsse, Dr. Fitzhugh's expert witness, testified:

> Q. And when [the fetus] comes out largely intact, does that mean that you're able to remove the fetus completely from the woman without any parts disarticulating?
>
> A. Occasionally that can be.
>
> Q. And in the instance where that happens, I take it you wouldn't engage in any other act to kill the fetus other

> than removing it and to place it where you place the tissues you are removing; is that correct?

A.   Correct.

Dr. Fitzhugh could not think of any threat to the mother's health under this scenario, and he candidly recognized that his destruction of the fetus at that stage would not be to preserve the mother's health, but rather to complete the abortion procedure. As he testified:

Q.   And the health benefit [to the mother] is the termination of the pregnancy, not necessarily the death of the fetus; is that correct? In other words — let me phrase it this way — termination of the pregnancy is going to eliminate the health concern with respect to the [mother's] conditions that you have just described, whether or not what is removed is alive or dead; is that correct?

A.   My ultimate job on any given patient is to terminate that pregnancy, which means that I don't want a live birth.

The district court assumed that the Virginia statute prohibits intact deliveries of live fetuses — as did the Nebraska statute reviewed in the *Carhart* case — and therefore concluded that under *Carhart* the statute had to have a health exception.[3] The district court reasoned that by prohibiting intact deliveries, the doctor had to dismember or destroy the fetus inside the mother to comply with the statute, which presented a greater health risk to the mother than would an intact delivery. The doctor's sharp instruments, and sharp fetal fragments, as well as "uterine perforation," were far riskier to the mother than the intact delivery. But the district court's assumption that the statute prohibits intact deliveries of live fetuses finds no basis in the Virginia statute. The district court applied *Carhart* without recognizing the distinction between the Nebraska statute and the Virginia statute.

In contrast to the statute at issue in *Carhart*, which was fairly con-

---

[3]The majority now adopts the same argument. *See ante* at 9-10.

strued as banning intact deliveries, the statute here cannot be so construed. Specifically, the *Carhart* statute in prohibiting any "partial birth *abortion*," banned the "deliberate[ ] and intentional[ ] *deliver[y]* into the vagina [of] a living unborn child . . . for the purpose of *performing a procedure*" that knowingly would result in the death of the child. The procedure was banned regardless of where within the mother the fetus was destroyed or how it was destroyed. *Carhart*, 530 U.S. at 921 (quoting Neb. Rev. Stat. § 28-328(9)) (emphasis added). The statute in this case bans any "deliberate act . . . intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that . . . does kill such infant." Va. Code Ann. § 18.2-71.1(B). In other words, the *Carhart* statute banned the *delivery* part of a partial birth abortion procedure, whereas the Virginia statute does not ban the delivery part if the intact fetus is not destroyed. It bans only the killing part of such a procedure. The distinction is important because it makes the question of whether intact deliveries have safety advantages over deliveries involving dismemberment irrelevant in this case, for the statute has nothing to say about, and indeed permits, intact deliveries when the fetus is not deliberately destroyed. *But see ante* at 8-9 (focusing on the health advantages of intact deliveries). The only relevant question in an intact delivery is whether a woman's health would be endangered by prohibiting the physician from intentionally killing a fetus that has been so delivered and is still alive.

That brings us to Dr. Fitzhugh's second scenario for objecting to the statute: that during an abortion procedure involving the breach delivery of the fetus, the fetal skull sometimes becomes lodged in the mother's cervix, forcing him to kill the fetus by crushing its skull so as to preserve the health of the mother.

It must be noted first that when the head of the fetus becomes lodged in the mother's cervix, the condition poses a threat to the mother's *life*, and to abate that risk, Dr. Fitzhugh prefers to crush the skull of the fetus and then remove it. As he testified:

> Q. So would you agree with me that if you had the — if you did not complete the delivery in the scenario you just described [where the head was lodged] — you know, you said collapsing the skull or whatever other

means — *that the woman's life would be at risk*? Do you agree with that?

A.   Yes sir.

(Emphasis added). The Virginia statute, however, makes an exception from its proscriptions "to prevent the death of the mother." Va. Code Ann. § 18.2-71.1(E).

Thus, under neither scenario advanced by Dr. Fitzhugh to challenge the constitutionality of Virginia's statute has he demonstrated the need for a *health* exception.

Even if Dr. Fitzhugh's position could be understood to demonstrate a risk to the mother's health, and not to her life, his opinion on such a risk and the opinion of doctors presented by Virginia differ markedly. The record demonstrates that a genuine issue of material fact exists as to whether substantial medical authority in fact supports the proposition that barring physicians from collapsing or crushing the fetal skull would endanger the health of a woman. In these circumstances, summary judgment cannot be granted.

Dr. Fitzhugh did present some evidence that prohibiting a physician from crushing or collapsing a fetal head that becomes lodged in the mother's cervix would endanger the mother's life, or perhaps health. The evidence advanced by Dr. Fitzhugh establishes that in approximately .5% of the D&E abortions Dr. Fitzhugh and his clinics perform, the skull becomes lodged in the woman's cervix. This places the woman's life at risk according to Dr. Fitzhugh. And according to Dr. Charles deProsse, Dr. Fitzhugh's expert witness, the physician "must compress" the fetal skull.

The evidence presented by Virginia, however, painted a substantially different picture.[4] According to the Commonwealth's testimony, the prohibitions in the statute would not endanger a woman's health

---

[4]Even though the district court excluded a significant amount of Virginia's evidence, I conclude that it did so improperly, *see* Part V, *infra*, and accordingly consider some of that evidence to describe Virginia's presentation of a different factual picture.

because there are equally safe alternatives in the circumstances covered by the statute. First, Dr. Harlan Giles testified that no medical authority supports the proposition that it would be necessary to crush a lodged fetal skull. Similarly, Dr. John Seeds testified that there "is no clinical scenario [he could] imagine where a physician would have to resort to a procedure that violated [the statute]."

Moreover, Virginia introduced evidence showing that equally safe alternatives exist for completing an abortion during which the fetal skull has become lodged in the mother's cervix. Dr. Giles testified that the cervix will often dilate and naturally expel the skull if given sufficient time. He testified that the physician can also lightly compress (as opposed to crush) the skull using forceps without intending to kill the fetus to remove it from the cervix. Finally, he noted that certain muscle relaxants can be used to increase cervical dilation and thereby dislodge the skull. Dr. Giles indeed provided testimony that crushing the fetal skull, as preferred by Dr. Fitzhugh, actually *increases* the risk to a woman's health due to fragmentation of bony parts and maternal tears. Similarly, Virginia provided the testimony of Dr. Mark Neerhof given before the House of Representatives Judiciary Committee, in which he stated that injecting scissors into the fetal skull to crush it subjects the woman to the risk of lacerations to her cervix and uterus and could result in severe bleeding, shock, and maternal death.

Dr. Fitzhugh's only response to this contradicting evidence is to argue that unless *Virginia proves* that no medical authority supports Dr. Fitzhugh's assertion, Dr. Fitzhugh must win and the statute must be stricken. Dr. Fitzhugh forgets, however, that he bears the burden of proving that substantial medical authority supports his proposition that the statute requires a maternal health exception, and when questions of fact about this proposition exist, the district court is precluded from entering summary judgment. The issue must be reserved for trial, as was done in *Carhart*.

IV

The district court advanced three additional grounds for striking down Virginia's statute, which the majority did not address because of its ruling that the Virginia statute is *per se* unconstitutional for fail-

ing to include a maternal health exception. Because of my would-be ruling that Virginia's narrow statute need not contain such an exception, I will address these additional three grounds advanced by the district court, in order.

A

First, in holding the Virginia statute unconstitutional, the district court relied on *Carhart*'s holding that a statute that "'imposes an undue burden on a woman's ability' to choose a D&E abortion . . . unduly burden[s] the right to choose abortion itself." *See Carhart*, 530 U.S. at 930 (quoting *Casey*, 505 U.S. at 874). The district court identified two scenarios in which a physician, who intends to perform a D&E, would violate the statute. The first scenario occurs when a woman's cervix is aligned so closely with her vagina that during the abortion procedure, the cervix gets pulled outside her vagina. Dr. Fitzhugh estimated that he sees such an anatomical configuration in approximately one-third of his second-trimester abortion patients. He claims that in such circumstances, dismemberment of the fetus occurs on the outside of the woman's body and therefore would not fall within the statute's exception for D&E procedures generally. *See* Va. Code Ann. § 18.2-71.1(B) (excepting from the statute's ban the D&E procedure "involving dismemberment of the fetus prior to removal from the body of the mother").

As an initial matter, the district court erred by resolving, on summary judgment, the factual question of whether such a scenario ever actually occurs. Dr. Fitzhugh's own expert, Dr. deProsse, admitted that no medical literature mentions such an anatomical scenario. Moreover, both of Virginia's experts expressed similar doubts and even questioned the *possibility* that a woman's cervix could emerge beyond her vagina during a D&E procedure. Dr. Seeds testified that based on his overall clinical experience, he "would not expect to be able to pull a woman's cervix to the level of the vaginal introitus . . . unless the woman had extremely elastic ligaments as a result of multiple, full-term, vaginal deliveries or unless [he] was using too much force." Dr. Giles testified similarly and noted that he had never seen, read about, or heard about such a situation occurring during a D&E procedure. By disregarding this testimony and accepting Dr. Fitzhugh's, the district court violated a basic requirement for entering

summary judgment — that there be no genuine dispute of material fact.

Moreover, the court misconstrued the statute or chose to construe it so that it could be found unconstitutional in the factual circumstances it found to exist. This was error. *See United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) (holding that when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter"). Dr. Fitzhugh explained that in the circumstances he described, the dismemberment that occurs during a D&E results from the fetus' passing through the cervix, and Dr. deProsse explained that the dismemberment might actually occur a few centimeters outside the woman's cervix. The district court chose to construe the statute as excepting the D&E procedure only when the dismemberment occurs inside the mother's body. Read more carefully (or so as to avoid constitutional questions), the statute excepts the D&E procedure so long as it is performed before the *fetus* is removed from the mother's body. *See* Va. Code Ann. § 18.2-71.1(B)(iii) (excepting from the statute's ban a D&E procedure "involving dismemberment of the fetus prior to removal from the body of the mother").

The district court also relied on a second factual scenario to find the statute unconstitutional — when the physician intends to perform a D&E involving dismemberment of the fetus inside the woman's body, but the fetus instead prolapses through the cervix intact and its skull becomes lodged in the woman's cervix. The court found that the physician would then have to crush the fetus' skull to complete the abortion, but by doing so, would expose himself to criminal liability under the statute. Because a physician could not know before beginning the D&E procedure how far the fetus would prolapse, the court concluded that the statute unconstitutionally burdens the abortion right by creating a dilemma for the physician every time he performs a D&E procedure.

The problem with the district court's conclusion is that it had to resolve the major disagreement about the material facts in this case on a motion for summary judgment. As explained with respect to the

need for a maternal health exception, *supra* at Part III, the question of whether the fetus' skull must be crushed at the point when the head has become lodged in the cervix is not resolved by the materials submitted by the parties, and a genuine dispute of material fact remains. Virginia's evidence showing that equally safe or even safer alternatives exist, including gently compressing the skull, using cervical muscle relaxants, and waiting for the cervix to dilate further, cannot be ignored or resolved by the court in the summary judgment procedure.

B

The district court struck down the statute also because it denies a woman a right to choose appropriate medical treatment when she is suffering from an incomplete miscarriage. In the case of a miscarriage, however, the cause of the fetus' demise is natural, and the doctor is called upon to treat the mother and assist in the natural process. In no ordinary sense can it be said that the physician engages in a "deliberate act that . . . is intended to kill a human infant who has been born alive." *See* Va. Code Ann. § 18.2-71.1(B). Even Dr. Fitzhugh's expert, Dr. deProsse, testified that the physician's intent in treating an incomplete miscarriage would be to treat the mother and "preserve the health of the mother," not to kill the fetus.

C

Finally, the district court found the statute unconstitutional on vagueness grounds for failing to give physicians fair notice of what conduct it prohibits. A statute is unconstitutionally vague if it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Chicago v. Morales*, 527 U.S. 41, 56 (1999).

Here, the district court found terms such as "from its mother," "from the body of the mother," "outside the body of the mother," and "involving dismemberment of the fetus prior to removal from the body of the mother" unconstitutionally vague. But its conclusion is unsupportable. Not only is it hard to imagine how a person of normal intelligence would not understand those everyday words, but the record demonstrates that Dr. Fitzhugh himself did not find them

ambiguous. For example, when asked whether it would be medically advisable for him to "start dismembering the fetus, the part of the fetus that is already out of a woman," rather than express any confusion over the meaning of the question, Dr. Fitzhugh answered the question in the negative, without hesitation.

In sum, none of the additional grounds advanced by the district court to find the statute unconstitutional has merit.

V

Finally, I address Virginia's contention that the district court stacked the factual deck against it by improperly excluding from consideration material evidence that would have supported the statute and, more importantly, placed any factfinding by the district court deeper in doubt. In particular, Virginia contends that the district court erred in (1) striking the testimony of Virginia's expert, Dr. Harlan Giles; (2) striking portions of the testimony of Virginia's other expert, Dr. John Seeds; and (3) excluding testimony given before the United States House of Representatives Committee on the Judiciary during hearings on the federal partial-birth abortion ban. I address these in order.

A

Virginia proffered the testimony of Dr. Giles, an obstetrician and gynecologist specializing in maternal and fetal medicine, to support several parts of its defense, including the proposition that equally safe alternatives to any procedure banned by the statute exist. The district court struck all of Dr. Giles' testimony finding it to be "unreliable because it [was] inconsistent and incoherent." In particular, the district court found that Dr. Giles' testimony concerning the use of forceps to dislodge a fetal head and his experience using medication to achieve cervical dilation during D&E procedures contradicted testimony that Dr. Giles had given in a prior lawsuit. The district court relied primarily on this inconsistency to disqualify Dr. Giles.

It is of course well-established that under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137 (1999), a district court has an obligation to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Although the Supreme Court in *Kumho Tire* considered the inconsistency of an expert's testimony as a factor in not certifying the expert, the Court's overriding concern in that case was the unreliability of the method used by the expert. *Kumho Tire*, 526 U.S. at 157. In contrast, here, the inconsistencies in Dr. Giles' testimony constituted the district court's main reason for the exclusion. The inconsistencies, however, were between the testimony given by Dr. Giles in this case and the testimony given by Dr. Giles in an earlier case. Without exploring the reasons for any difference or allowing for an explanation, the district court incorrectly placed itself in the role of a factfinder, weighing the credibility of the witness.

The district court also supported its decision to exclude Dr. Giles' testimony with its conclusion that one method Dr. Giles advocated for completing an abortion in which the fetus' head became lodged in the mother's cervix — waiting awhile for the fetus' head to expel on its own — fell below the accepted standard of care. If true, such a finding might justify the conclusion that Dr. Giles' methods are unreliable within the meaning of *Kumho Tire*. Yet, to reach its conclusion that Dr. Giles' proposed methods would constitute malpractice, the court relied on the testimony of a witness that had been identified only as a rebuttal witness (because the witness could not testify on direct due to a conflict of interest). Moreover, even if the rebuttal witness' testimony was properly considered, it did not directly call into question Dr. Giles' method. Specifically, the rebuttal witness testified that it would "constitute medical malpractice for a physician to 'just wait' for up to a *couple of hours* for the uterus to contract and the cervix to dilate on its own to remove a lodged fetal head during a previability D&E *where the woman is under any type of sedation*." (Emphasis added). Dr. Giles specifically stated in his testimony, however, that he would not wait longer than 10 to 20 minutes for cervical dilation if the woman were under a general anesthetic. Finally, the testimony of Dr. Fitzhugh's own expert witness, Dr. deProsse, indicated that Dr. Giles' method would not be a breach of the standard of care, providing evidence that directly conflicted with the testimony of Dr. Fitzhugh's rebuttal witness. Dr. deProsse testified that a physician

could wait as long as 24 hours after a fetal head became lodged without creating a risk of infection.

Finally, the district court supported its decision to strike the testimony of Dr. Giles by noting that Dr. Giles could not point to any medical literature to support his theory that cervical muscle relaxants could be used to dislodge a fetal head that had become lodged during a D&E procedure. Disqualifying Dr. Giles on this basis is particularly troubling because Dr. Fitzhugh's experts similarly failed to support several of their opinions with documented medical authority, yet the court chose to rely on them. For example, Dr. deProsse testified that the intact D&E procedure (also described as the dilation and extraction or D&X procedure) has safety advantages over conventional D&Es and other abortion procedures, but he could not recall any medical literature supporting that proposition. Similarly, Dr. deProsse testified that, depending on a woman's individual anatomy, her cervix might be outside her vaginal introitus at times during a D&E. Yet, Dr. deProsse knew of no medical literature documenting that anatomical configuration. Notwithstanding the lack of medical literature to support Dr. deProsse's testimony, however, the district court considered and relied on it. The court's rejection of Dr. Giles' testimony for that reason created a double standard and was an abuse of discretion.

B

The district court also struck portions of the testimony of Virginia's other expert witness, Dr. John Seeds, based on the district court's finding that Dr. Seeds was an expert on neither abortions nor D&E procedures. Virginia relied on Dr. Seeds' testimony for his expert opinions on whether the health concerns raised by the appellees were medically legitimate, whether a physician would ever have to resort to a procedure that violated the statute, and whether there exists any safer alternative means for performing abortions than any procedure that would violate the statute. In addition, Dr. Seeds answered general questions about the female anatomy.

Again, the district court abused its discretion in excluding the testimony of Dr. Seeds, particularly with his credentials. Dr. Seeds is board-certified in the fields of obstetrics and gynecology ("OBGYN") and of maternal/fetal medicine. He is currently the chair of the

OBGYN department at the Medical College of Virginia, Virginia Commonwealth University. He does not currently perform abortions, but he is familiar with the procedures performed by other physicians in his department. As chairman of the OBGYN department, Dr. Seeds testified that he would feel obligated to advise his staff professionally if the statute would implicate the staff's abortion practices in any way.

The district court concluded solely from the fact that Dr. Seeds does not perform abortions that his testimony in this matter is unreliable. But as an OBGYN expert, Dr. Seeds obviously knows more about the female anatomy, pregnancy, and birth than the average juror. In fact, Dr. Seeds, as an expert in maternal/fetal medicine, may actually be more qualified to render an opinion than Dr. Fitzhugh's experts, neither of whom has expertise in maternal/fetal medicine. As a maternal/fetal medicine specialist, Dr. Seeds has extensive training in the management of high-risk pregnancies, which makes him highly qualified to speak to possible complications occurring during pregnancy that could necessitate the types of procedures banned by the statute.

The exclusion of Dr. Seeds' testimony is so highly irregular that it is difficult for me to conceive of the motive for the district court's ruling. In any event, I think it clear that the district court abused its discretion in excluding Dr. Seeds' testimony.

C

Finally, the district court excluded parts of the Congressional Record for the federal partial-birth abortion ban as evidence that such a ban would not endanger a woman's health. This exclusion covered all parts of the Congressional Record, including the House Committee Report and the congressional testimony of Dr. Mark Neerhof, an OBGYN professor at Northwestern University Medical School. Specifically, the district court found that the report was "political" and "untrustworthy" and that Dr. Neerhof's statement was hearsay.

Although it was within the district court's discretion to conclude that the Congressional Report was unreliable, the district court again applied a double standard to reach such a conclusion. In particular, the court repeatedly relied on hearsay statements made by the Ameri-

can College of Obstetricians and Gynecologists ("ACOG"), which were presented by Dr. Fitzhugh. I can see no relevant difference between Dr. Neerhof's testimony before Congress and the ACOG statements. If the district court chose to exercise its discretion to exclude such testimony, then it should have done so across the board. If it chose to include them as legislative facts, then it should have done so uniformly. Its ruling against Virginia only, however, is, I submit, unexplainable and an abuse of discretion.

VI

The choice made today by the majority to strike down Virginia's partial-birth infanticide statute is not compelled by the Constitution, nor by any Supreme Court case. As such, the majority opinion stands on its own reasoning and amounts to a momentous step in disconnecting our law from accepted moral norms. In gratuitously rejecting Virginia's law, the majority announces a strange law that the liberty protected by the Constitution guarantees a woman the right to destroy her live fetus after it has been delivered halfway or fully into the world. The majority opinion stands for nothing less.

Virginia enacted its partial-birth infanticide statute, focusing on the life of infants delivered halfway or fully into the world, rather than on abortion procedures themselves. Indeed, it accepted as legal various "normal" procedures employed in over 95% of abortions in America. Virginia's statute is thus narrowly drafted and fits within the exceptions recognized by *Carhart*. *See Carhart*, 530 U.S. at 939 ("[I]t would have been a simple matter, for example, to provide an exception for the performance of D&E and other abortion procedures"); *id.* at 950 (O'Connor, J., concurring) ("[S]ome other States have enacted statutes more narrowly tailored . . . by specifically excluding from their coverage the most common methods of abortion, such as the D&E and vacuum aspiration procedures"). This was Virginia's specific goal.

It is an affront to Virginia's sovereignty to extend *Carhart* to strike down its statute in the name of the liberty protected by the Constitution. It should make us question whether we understand liberty, or if we do, whether we are tarring it with the color of political ideology that tarred the national ideals of other ages when immoral laws were

imposed by ideological commands. It provides us no cover to assert vacuously that we are doing what the Supreme Court commands. The truth remains open for all to see that we are doing not what is required by law, as I have demonstrated in some detail, but what we will.[5]

As it must, judicial authority finds process and reason as its supporting pillars, but reason alone applied formulaically and without regard to context can wring results that even the most carefully reasoning decisionmaker finds unacceptable. At the depths of judicial decisionmaking lies a bedrock demanding accountability to the mind's sense of right, and this bedrock guides or perhaps even vetoes whatever absurdities reason might deliver.

In the opinions we issue today, we speak of the legal and the illegal ways to dismember the arms and legs of human fetuses and the legal and illegal ways to crush the budding human head. The doctors, of course, are given a choice: They can insert scissors into the base of the neck and suck out the brain matter, or they can crush the tender skull with forceps. Indeed, some of these procedures remain legal under Virginia's statute, but the statute does prohibit the destruction of a fetus halfway or fully delivered from its mother's body. Dr. Fitzhugh complained of this proscription because — even though killing the infant could not affect the mother's health at that stage — he could not complete his job. He said, "I don't want a live birth." The majority redresses his complaint with the ruling today.

---

[5]In suggesting that I am "mandat[ing] [my] own moral code" as I write to uphold Virginia's statute, *ante* at 17, the majority presumes that the Supreme Court has, in *Carhart*, protected conduct that violates "my moral code" and that I should address my objections to the Supreme Court's decision in *Carhart*. The Nebraska statute found unconstitutional in *Carhart*, however, differs materially from the Virginia statute, most significantly in that the former proscribed certain abortion *procedures* while the latter bans only the destruction of living fetuses. With this material difference, I have suggested that we can, consistent with Supreme Court precedent, accommodate Virginia's deeply held moral position without offending *Carhart*, and that in going beyond the bounds of the *Carhart* holding to strike down the Virginia statute, we trample not only the statute but also the moral grounds on which it rests.

Even the majority's opinion, however, seems to have shuddered at discussing the nuances of fetal destruction, employing uncommon and clinical words as if they would dull the moral context:

> In the case of a vertex presentation, the physician collapses the fetal calvarium and then extracts the entire fetus through the cervix. In the case of a breech presentation, the physician pulls the fetal trunk through the cervix, collapses the fetal calvarium, and then completes extraction of the fetus through the cervix. *Ante* at 6.

> \* \* \*

> A third variation prohibited by the Act involves the D&E in which fetal disarticulation occurs outside of the woman's body. Disarticulation generally occurs beyond the cervical os (the lower portion, or opening, of the cervix) as a result of traction against the cervix. However, disarticulation may occur outside of the woman's body when there is little or no space between the cervical os and the vaginal introitus (the vaginal canal) or when the cervical os prolapses (emerges) outside the vaginal introitus. *Ante* at 6.

I too have shuddered and must turn away.

Can we not see that our discussions and the law we make in striking down Virginia's prohibition are unfit for the laws of a people of liberty? I wonder with befuddlement, fear, and sadness, how we can so joyfully celebrate the birth of a child, so zealously protect an infant and a mother who is pregnant, so reverently wonder about how human life begins, grows, and develops, and at the same time write to strike down a law to preserve a right to destroy a partially born infant. If the disconnect is explained by personal convenience, then we must reason that all morality is personal, without commonality and source. The product of such chaos is unfathomable.